IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEAN DUNGAN, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) Civil Action No. 15-989-GMS <br> ) |
| FLIGHTSAFETY INTERNATIONAL INC., | ) <br> ) |
| Defendant. | ) <br> ) |

## MEMORANDUM

### I. INTRODUCTION

On September 30, 2015, Plaintiff, Dean Dungan ("Dungan") brought this action in the Delaware Superior Court for New Castle County against Defendant FlightSafety International Inc. ("FlightSafety"), his former employer, for wrongfully terminating his employment. (D.I. 1.) FlightSafety properly removed this action to the United States District Court for the District of Delaware. (*Id.*) Thereafter, Dungan filed an Amended Complaint on February 23, 2016, alleging that FlightSafety discriminated against him under the Age Discrimination in Employment Act ("ADEA") and Delaware Discrimination in Employment Act ("DDEA"), and violated the implied covenant of good faith and fair dealing ("the Covenant") under Delaware law when it terminated his employment. (D.I. 15.) On December 14, 2016, FlightSafety moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that FlightSafety did not terminate

Dungan's at-will employment in violation of the age discrimination laws or the Covenant.[1] (D.I. 27-28.) For the reasons that follow, the court will grant FlightSafety's motion.

## II. BACKGROUND

### A. Dungan's Employment with FlightSafety

Dungan began his at-will employment at FlightSafety in 1986 as a part-time employee. (D.I. 29 at A009-A010.) FlightSafety is a corporation which provides flight training services to private and commercial pilots. (D.I. 28 at 2.) In 2000, Dungan started full-time work at FlightSafety. (D.I. 29 at A009.) From 1986 until his termination on August 18, 2015, Dungan held several different positions: traffic controller instructor, Hawker pilot instructor, program manager, and director of training. (*Id.* at A010-A012.) The program manager supervised the instructors of a certain program to ensure they followed company and Federal Aviation Administration ("FAA") procedures and regulations. (*Id.* at A012-A014.) To ensure all procedures and regulations were followed, the program manager would review all training records sent by the instructors. (*Id.* at A017.) If a regulation or procedure was not followed, the Program Manager would inform the instructor that the pilot would need to return to complete the necessary training. (*Id.*) The Director of Training supervised all the program managers to ensure proper procedures were followed. (*Id.*) From 2005 to his termination in 2015, Dungan was the Director of Training. (*Id.* at A018.) From 2011 until his termination, Dungan received very positive reviews for his work, and received merit based salary increases each year. (*Id.* at A061-A080.)

The majority of pilots trained at FlightSafety are taught with flight simulators. (*Id.* at A014.) All FAA regulations regarding pilot training apply to training done on flight simulators.

---

[1] In his opposition brief, Dungan explicitly conceded his age discrimination claims. (D.I. 31 at 1.) As a result, the court need not address any arguments concerning the ADEA or DDEA. The breach of implied covenant of good faith and fair dealing is the only remaining claim at issue.

2

(*Id.*) In particular, Part 60 of FAA regulations requires pilots to complete a certain number of takeoffs and landings from an approved airport (real or simulated) in order to obtain or renew a pilot's license. (*Id.*) Airports which are approved by the FAA for pilot training are known as Part 60 airports. (*Id.*) If a pilot completes a takeoff or landing at a non-Part 60 airport, then the landing/take-off does not count towards the training requirements. (*Id.*)

### B. July 2015 Flight Training Record Incident

In July 2015, Linda McRae ("McRae"), the Program Manager, informed Dungan that training records involving two pilots, Edward Craig ("Craig") and Martin Humpherson ("Humpherson"), reflected take offs and landings at non-Part 60 airports. (*Id.* at A025-A027; D.I. 31-1 at B037.) After receiving this information from McRae, Dungan called a meeting to discuss the incident with McRae and Assistant Program Manager Jay Hettler ("Hettler"). (D.I. 29 at A025.) Dungan was unable to review the training records during the meeting, as no one brought the records to the meeting. (*Id.*; D.I. 31-1 at 47.) During the meeting, McRae told Dungan that Craig and Humpherson did not perform enough landings at a Part 60 airport, but McRae believed the two pilots had completed enough takeoffs and landings to meet FAA requirements. (D.I. 29 at A025.) Believing McRae's account, Dungan suggested that the record could be edited, remarking "it doesn't make any difference. Either leave them in or take them out. It doesn't make any difference as long as we have the number of landings [for satisfying training requirements.]" (*Id.*, 100:2-5.) When McRae asked Dungan whether the record should be changed, he responded "[n]o. . . . [M]ake sure that, you know, we're all on the same page." (*Id.*, 15-17.)

To gather more information, the group called Ray Brown ("Brown"), the flight instructor for Craig and Humpherson. (*Id.*) Brown, who was not the flight instructor for Craig and Humpherson during their previous two training sessions at FlightSafety, was unable to tell Dungan

3

whether the clients recorded enough takeoffs and landings at Part 60 airports. (*Id.* at A025-A026.) After calling Brown, Dungan told the group to ensure the clients satisfied the FAA requirements for training Craig and Humpherson; Dungan also told the group that if Craig and Humpherson satisfied the landing requirements, the non-Part 60 airports could be edited out of the training records. (*Id.* at A026.) Both Brown and McRae informed Dungan they were comfortable with the group's decision before leaving Dungan's office. (*Id.*)

After the meeting, McRae became uncomfortable with Dungan's comments during the meeting, and spoke to the Center Manager, Ralph Lintelman ("Lintelman"), about the events. (D.I. 29 at A050; D.I. 31-1 at B045-B046.) McRae apprised Lintelman of the following: (1) Dungan wanted the non-Part 60 airports to be removed from the record, and (2) Dungan called Brown to demand he edit the record. (D.I. 31-1 at B046-B047.) Lintelman, concerned about McRae's version of events, suggested she call Dungan to tell him that she was uncomfortable editing the record, and that it should be restored. (*Id.* at B046.) McRae called Dungan, telling him she was uncomfortable editing the training record, and that Craig and Humpherson should be brought back for retraining. (*Id.*) Dungan responded that the records could be left in the original form, and he was comfortable processing the records. (D.I. 29 at A028; D.I. 31-1 at B046.) Dungan later discussed the situation with Lintelman. (D.I. 29 at A033; D.I. 31-1 at B055.)

### C. Dungan's Termination

Dan MacLellan, ("MacLellan"), the Vice President of Operations at FlightSafety received an anonymous letter—dated August 6, 2015—describing the July 2015 incident. (D.I. 31-1 at B068.) This letter stated that Dungan behaved unethically by "falsifying official FAA training records." (*Id.*) The letter charged Dungan with coercing "the instructor" (Brown) to change the flight records. (*Id.*) The letter also stated the "PM," the abbreviation for Project Manager and

4

likely referring to McRae, resolved the situation by reporting the incident to the center management team, who thereafter notified the clients they needed to return to complete training. (*Id.* at B068-B069.) The letter ends by imploring MacLellan to "take the appropriate actions to ensure this unethical, dishonest, and immoral behavior does not occur again." (*Id.* at B069.)

In response to the letter, MacLellan e-mailed a copy to Lintelman. (D.I. 29 at A051.) During a short telephone conversation between MacLellan and Lintelman, Lintelman confirmed that the events of July 2015, as described in the letter, were "accurate to a tee." (*Id.*, 27:15.) Based on this information, MacLellan directed Lintelman to fire Dungan. (*Id.*) On August 18, 2015, FlightSafety terminated Dungan for misconduct resulting from the July 2015 incident. (*Id.* at A033, A085.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving no genuine dispute of fact exists. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if a reasonable jury could return a verdict for the nonmoving party. *Id.* In deciding the motion, the court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. Factual disputes concerning irrelevant or unnecessary facts will likewise not preclude summary judgment. *Id.* at 248. If the moving party is able to demonstrate no disputed material

5

facts exist at trial, the nonmoving party can defeat the summary judgment motion by demonstrating with specific facts that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587 (citing Fed. R. Civ. P. 56(e)). However, the nonmoving party cannot rely on its pleadings, nor unsupported assertions, conclusory allegations, or suspicions, to create a genuine issue for trial. *Celotex*, 477 U.S. at 325. Rather, the nonmoving party must support their assertion that a material fact is in dispute by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex*, 477 U.S. at 322-23 (1986).

## IV. DISCUSSION

FlightSafety moves for summary judgment on count one of the amended complaint. In support of its motion, FlightSafety contends that it is entitled to summary judgment because Dungan has failed to adduce facts sufficient to show that FlightSafety breached the Covenant. The court will address whether there are any material factual disputes and whether FlightSafety is entitled to judgment as a matter of law.

### A. Delaware Law Governing Breach of Implied Covenant of Good Faith and Fair Dealing

Under Delaware law, employees are generally deemed employees at will, *i.e.*, they can be terminated without cause, independent of the employer's motive. In *Merrill v. Crothall-Am., Inc.*,

606 A.2d 96, 101 (Del. 1992), the Delaware Supreme Court carved out a limited implied covenant of good faith and fair dealing in connection with at-will employment contracts. The implied covenant of good faith and fair dealing has been limited to four exclusive categories:

> (1) where the termination violated public policy;
> (2) where the employer misrepresented an important fact and the employee relied thereon either to accept a new position or remain in a present one;
> (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and
> (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

*Lord v. Souder,* 748 A.2d 393, 400 (Del. 2000) (citing *E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 441–44 (Del. 1996) (internal quotation marks omitted).

Here, Dungan alleges that FlightSafety breached its implied covenant of good faith and fair dealing on the fourth category above. To argue that he was terminated based on a "fictitious, false, and exaggerated record created and promoted by Lintelman, either by himself or with others," (D.I. 15 ¶ 34), Dungan principally relies on *Pressman*. The District of Delaware has recognized that *Pressman* "only held culpable the *manufacture* of grounds for dismissal, not the *statement* of a false reason for dismissal." *Williams v. Caruso,* 966 F. Supp. 287, 291 (D. Del. 1997).

### B. Whether Material Factual Disputes Exist

To survive a motion for summary judgment, Dungan must support his claim with facts sufficient to show that a material issue existed regarding FlightSafety's alleged breach of the Covenant. The parties offer differing accounts of the July 2015 incident, and the veracity of the anonymous letter sent in August 2015. For example, Dungan claims the group came to a consensus that the training records be researched, and only if the takeoff/landing requirements were satisfied would the training record be edited. (D.I. 29 at A025-A026.) On the other hand, FlightSafety asserts that Dungan demanded or coerced Brown to change the record. In short, there is a dispute

7

as to whether Dungan—and others—made an honest mistake regarding a record, or Dungan violated FAA procedure despite hesitation to do so from the group. (*Id.* at A025-A029, A051-A052; D.I. 31-1 at B040-B042.)

Either of these two conclusions would be immaterial to the question of whether the implied covenant of good faith and fair dealing was breached in an at-will employment relationship. At-will employment provides employers great latitude to fire an employee absent narrowly tailored exceptions to the doctrine. Although an employer falsifying, manipulating, or otherwise manufacturing a reason to terminate an employee is such an exception, both sides agree that FlightSafety terminated Dungan due to his conduct in connection with the July 2015 incident. (D.I. 31 at 1; D.I. 34 at 2-3.) In other words, neither party disputes the violation of FAA regulations by altering a training record. (D.I. 29 at A-15; D.I. 28 at 4-6.) Second, it is undisputed that Dungan suggested to Brown that he could change the training record. (D.I. 31 at 6; D.I. 34 at 2.) Third, MacLellan undisputedly received an anonymous letter concerning the July 2015 incident. (D.I. 28 at 5; D.I. 31 at 15.) Fourth, neither party disputes that MacLellan discussed Dungan's termination with Lintelman, and ordered Dungan to be terminated. (D.I. 28 at 5-6; D.I. 31 at 15.) Finally, neither party disputes that Lintelman informed Dungan on August 18, 2015 that he was being terminated for a "lack of integrity" regarding the July 2015 incident. (D.I. 28 at 6; D.I. 31 at 8.) Because the parties agree on the aforementioned facts, FlightSafety has demonstrated the absence of material facts in dispute regarding the cause of Dungan's termination, and by extension, the existence of a manufactured reason for Dungan's termination.

Next, the court will address the arguments raised by Dungan in opposition to the motion. First, Dungan contends that the potential exaggerations in the anonymous letter, as well as the accounts of McRae or Lintelman, can rise to the degree of falsified information required to satisfy

8

the exception to at-will employment, and therefore pose a material issue for a jury to consider. (D.I. 31 10-12.) Case law has demonstrated, however, that such concerns would not rise to the level of "fraud, deceit, [or] misrepresentation" necessary to constitute breach of the Covenant. Despite Dungan's reliance on *Pressman* to implicate McRae's alleged misrepresentations, it is well established that the supervisor—not a subordinate like McRae—had to falsify information leading to an employee's dismissal. *See Williams*, 966 F. Supp. at 291 ("To constitute a breach of the implied covenant of good faith, the conduct of the employer must constitute an aspect of fraud, deceit or misrepresentation.") (internal quotations omitted) (citation omitted).

As to Lintelman's conduct as a supervisor, *Pressman* upheld the doctrine of employment at-will, stating a party cannot "point to the duty of good faith and fair dealing to support a requirement of good cause for termination." *Pressman*, 679 A.2d at 449. Furthermore, *Pressman* does not suggest an employer can be held liable for a breach of the covenant of good faith and fair dealing because the employer terminates an employee "in the context of a factually disputed work incident." *Layfield v. Beebe Medical Ctr.*, 1997 Del. Super. LEXIS 472, at *11 (Del. Super. Ct. July 18, 1997). Rather, an employer is allowed to terminate an employee "for its own legitimate business, or even highly subjective, reasons." *Merrill*, 606 A.2d at 103. As the breach of the covenant must be more than simply the absence of good cause for the employee's determination, Dungan's contentions regarding McRae and Lintelman are not material facts in the instant case, even when read in the light most favorable to Dungan. *Pressman*, 679 A.2d at 441.

Dungan also contends that his understanding of the records being either open or closed is a material fact for the jury. According to Dungan, he acted under the belief that the records were open—meaning they could be edited—and if he knew the records were closed, he would have acted differently. (D.I. 31 at 5-6.) For similar reasons as those stated above, the court finds this

9

argument unpersuasive. Even viewing the record in the light most favorable to Dungan, FlightSafety cited the fact that Dungan directed Brown to change the flight record—something which he admitted to doing—as the reason for Dungan's termination. (D.I. 29 at A030, A033.) This reason can be a legitimate business decision, even if highly subjective, and therefore conforms to the doctrine of at-will employment. *Merrill*, 606 A.2d at 103. Neither McRae, Lintelman, nor the anonymous letter discuss the record as being either open or closed, which demonstrates circumstantially that this fact was not relevant to the decision to terminate Dungan. (D.I. 31-1 at B041-B044; B068-B069.) Thus, a reasonable jury's determination would not change based on whether Dungan believed the record was open or closed, thereby making this fact immaterial.

Finally, Dungan argues that the record demonstrates that McRae "had professional animosity towards [Dungan]," and "her most recent efforts . . . caused, in part, Plaintiff's termination." (D.I. 31 at 12, 14 n.10) Dungan cites an affidavit from Matthew Cox, a former FlightSafety employee, to establish McRae's motive to harm him professionally. (D.I. 131 at B071.) Plaintiff further points to McRae telling Lintelman that the non-compliance was due to a "no-flap approach landing," when the meeting with Dungan focused on non-Part 60 airports. (D.I. 31-1 at B046, B054d, 17:24-18:1.) Under Delaware law, "[d]islike, hatred, or ill will alone, cannot be the basis for a cause of action for termination of an at-will employment." *Pressman*, 679 A.2d at 444; *see also Jacques-Scott v. Sears Holdings Corp.*, No. CA 10-422-LPS-MPT, 2011 WL 1059704, at *10 (D. Del. Mar. 22, 2011) ("[D]islike or hatred is not a basis for a cause of action under this element of the implied covenant of good faith and fair dealing. In order for plaintiff to maintain a claim under this fourth element, she must set forth facts beyond mere dislike, hatred or ill-will by her supervisors.") Even if taken as true, the evidence of McRae's ill-will toward

Dungan, does not give rise to an issue of material fact. *Jacques-Scott*, 2011 WL 1059704, at *30; *see also Layfield*, 1997 Del. Super. LEXIS 472.

## C. Whether FlightSafety Is Entitled to Judgment As a Matter of Law

Given the lack of material factual disputes regarding Dungan's termination, the court next determines whether FlightSafety is entitled to judgment as a matter of law. If Dungan fails to make a sufficient showing of the existence of an essential element of his case—the falsifying or manipulation of records to create a fictitious ground for dismissal—then summary judgment in favor of FlightSafety must be granted. *Celotex*, 477 U.S. at 322-23 (1986). Viewing the evidence in the light most favorable to Dungan, McRae mischaracterized and exaggerated Dungan's actions as nefarious when reporting the July 2015 incident to Lintelman. (D.I. 31 at 15.) Nonetheless, the events described by McRae occurred, and Lintelman is allowed to believe the account of a co-worker over Dungan. *Layfield*, 1997 Del. Super LEXIS 472, at *11. Similarly, the anonymous letter stating that Dungan's actions were "unethical, dishonest, and immoral," (D.I. 31-1 at B069), can be exaggerated and inaccurate, but nonetheless describe a version of events regarding the July 2015 incident. Lintelman's description of the letter being "accurate to a tee" can also be seen as perpetuating an inaccurate or exaggerated account of Dungan's actions, but Lintelman took this position based on information he received from both McRae and Dungan. (*Id.* at B054c-B055.) Therefore, even in viewing the evidence and reasonable inferences in favor of Dungan, the information provided to MacLellan cannot be classified as manufactured grounds for Dungan's dismissal or a bad faith attempt to falsify records to support termination as a matter of law. Thus, based upon the record before the court, Dungan cannot meet his burden on the breach of an implied covenant of good faith and fair dealing claim.

## V. CONCLUSION

For the foregoing reasons, the court grants FlightSafety's motion for summary judgment. (D.I. 27)

Dated: June 15, 2017

_____
UNITED STATES DISTRICT JUDGE